UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STATE FARM MUTUAL AUTOMOBILE
INSURANCY COMPANY, and
STATE FARM FIRE AND
CASUALTY COMPANY,

       Plaintiffs,

v.                    Case No. 8:20-cv-2428-VMC-TGW

ROBERT LEWIN, D.C., et al.,

       Defendants.
_____/

**ORDER**

This matter comes before the Court upon consideration of
Defendants Robert Lewin, D.C., 1-800-411-PAIN Referral
Service, LLC, Path Medical, LLC, and Path Medical Center
Holdings, Inc.'s Motion to Dismiss (Doc. # 32), and Defendants
David Cheesman, D.O., Chintan Desai, M.D., Ralph Marino,
M.D., Tie Qian, M.D., Roger Ramos, M.D., Donald Thomas III,
M.D., Nelson Vazquez, M.D., Michael Wilensky, M.D., Brittany
Chong, D.C., Ronald Golden, D.C., William Kurzbuch, D.C.,
Frank Lassiter, D.C., Adam Lewis, D.C., Dheeraj Manocha,
D.C., Lisa Nerbonne, D.C., Kieron Parchment, D.C., Joseph
Sefick, D.C., and Sarah Vleko, D.C.'s Motion to Dismiss and
to Join and Adopt Motion to Dismiss (Doc. # 33), both filed
on January 8, 2021. Plaintiffs State Farm Mutual Automobile

1

Insurance Company and State Farm Fire and Casualty Company responded to both Motions on February 5, 2021. (Doc. # 54). With leave of Court, Defendants replied on February 24, 2021. (Doc. # 57). For the reasons set forth below, the Motions are granted in part and denied in part.

## I.    **Background**

This case arose out of Defendants' alleged scheme of fraudulently collecting personal injury protection insurance ("PIP" insurance) benefits from Plaintiffs. (Doc. # 1 at ¶ 1). Plaintiffs are insurers and Defendants are legal and medical referral services, health care clinics, and health care clinic owners, medical directors, and chiropractors. (Id. at ¶¶ 1-2, 15-16). Specifically, Dr. Lewin is a chiropractor who, at the relevant times, owned 1-800-411-PAIN, a now dissolved legal and medical referral service for individuals in automobile accidents, and Path Medical Center Holdings, which owns Path Medical. (Id. at ¶¶ 2, 17-18). Path Medical "consists of twenty-eight licensed health care clinics located in [the] Orlando, Tampa, and South Florida areas." (Id. at ¶¶ 2, 19). Dr. Cheesman, Dr. Desai, Dr. Marino, Dr. Qian, Dr. Ramos, Dr. Thomas, Dr. Vazquez, and Dr. Wilensky are physicians who served as medical directors of the various Path Medical clinics. (Id. at ¶¶ 2, 20-28). Dr.

Chong, Dr. Golden, Dr. Kurzbuch, Dr. Lassiter, Dr. Lewis, Dr. Manocha, Dr. Nerbonne, Dr. Parchment, Dr. Sefick, and Dr. Vleko are chiropractors who worked at the Path Medical clinics. (Id. at ¶¶ 2, 29-38).

Plaintiffs aver that Defendants entered into a complex, multifaceted scheme to exploit patients' PIP benefits by submitting or causing to be submitted fraudulent bills for medically unnecessary and unlawfully rendered services. (Id. at ¶¶ 1, 3). The scheme involved Dr. Lewin and 1-800-411-PAIN "soliciting and steering individuals involved in auto accidents to Path Medical through a multi-million dollar marketing campaign that urges them to call [1-800-411-PAIN] purportedly for legitimate legal and medical referrals." (Id. at ¶¶ 4, 39, 61-80). At least some of those callers were then referred to Path Medical clinics. (Id. at ¶¶ 4, 70, 77). Despite these referrals, Defendants allegedly caused these patients to sign forms falsely representing that they were not solicited by any person to seek medical services from Path Medical. (Id. at ¶¶ 4, 78-80).

Once the individuals became Path Medical patients, Defendants allegedly performed services on those patients pursuant to a "predetermined protocol," designed to provide patients with medically unnecessary services so as to exploit

3

their PIP insurance benefits. (Id. at ¶ 5). The predetermined
protocol allegedly included: (1) "failing to legitimately
examine patients to determine the true nature and extent of
their injuries;" (2) "documenting a litany of diagnoses for
each patient, most often exceeding ten or more diagnoses per
patient, including predetermined findings of sprains and/or
strains, to justify a predetermined course of medically
unnecessary treatment;" (3) "falsely documenting [that]
patients had sustained an emergency medical condition . . .
as a result of their auto accident to maximize Defendants'
collection of [PIP insurance benefits];" (4) routinely
providing medically unnecessary durable medical equipment .
. . to patients;" (5) "providing the predetermined course of
treatment to patients, [consisting] of five or more
modalities on virtually every visit;" (6) "ordering medically
unnecessary x-rays and [magnetic resonance imaging
("MRIs");]" and (7) "performing final examinations falsely
documenting [that] nearly every discharged patient . . .
suffers from a permanent impairment, despite receiving the
extensive battery of services in the [p]redetermined
[p]rotocol." (Id.). Path Medical would then submit bills for
these services to Plaintiffs. (Id.).

    In support of this alleged predetermined protocol,

4

Plaintiffs provide examples of individuals who were treated following the same accident and were subject to "the same or nearly identical treatment" and "discharged with impairments on or about the same date." (Id. at ¶¶ 105-06). For example:

> [P]atient E.B.A., a thirty-one-year-old female, and patient J.G.O., a forty-two year old male, were involved in the same auto accident on February 21, 2017. Both patients began treatment at Path Medical-Kissimmee on the same day – February 22, 2017. On that date, Cameron Banks, D.C. prepared Initial Exam Reports for patients E.B.A. and J.G.O., diagnosed them with sprains/strains in multiple regions of the spine, recommended a predetermined course of treatment, and referred each patient for MRIs to "rule out internal derangement[.]" On March 1, 2017, Path Medical-Apex performed cervical and lumbar MRIs on patients E.B.A. and J.G.O. Desai prepared reports purporting to document his interpretation of each patient's MRIs, all of which reflected "herniations" and "bulges" of the cervical and lumbar spine. On March 29, 2017, Marino purportedly examined patients E.B.A. and J.G.O., diagnosed them with cervical and lumbar sprains/strains, recommended continued treatments, and documented they had both sustained an [emergency medical condition]. Pursuant to the predetermined course of treatment, patients E.B.A. and J.G.O. received the same litany of medically unnecessary treatment modalities, which consisted of at least five modalities across [twenty-one] dates of service. On May 3, 2017, Marino purportedly performed a final examination of patients E.B.A. and J.G.O. Although neither patient reported any pain, Marino diagnosed patients E.B.A. and J.G.O with a cervical sprain/strain, lumbar sprain/strain, and various "herniations" and "bulges" of the cervical and lumbar spine, and discharged both patients with a permanent impairment.

(Id. (citations omitted)). Plaintiffs aver that such

uniformity of treatment is not "credible given the unique circumstances presented by each patient, including each patient's physical characteristics, symptoms, history, ability to participate in treatment, and his or her response thereto." (Id. at ¶ 107).

Plaintiffs also provide an exhibit with examples of patients who were provided with MRIs, despite the fact that they suffered only soft tissue injuries, for which "MRIs are rarely indicated, and almost never indicated in multiple regions of the spine and body simultaneously, especially on a patient's first date of treatment." (Id. at ¶ 109; Doc. # 1-21). The complaint further provides examples of patients for whom MRIs were medically unnecessary, as exemplified by the fact that the MRI results were not utilized to alter the patients' treatment plans. (Doc. # 1 at ¶¶ 112, 114). For instance,

> M.M.B. initiated treatment at Path Medical on February 9, 2017. Between February 9, 2017 and February 14, 2017, Path Medical purportedly provided hot/cold packs, chiropractic manipulation, manual therapy, e-stim, mechanical traction, neuromuscular reeducation, and therapeutic exercise on each date of service. On February 15, 2017, MRIs of patient M.M.B.'s cervical and lumbar spine were performed at Path Medical-Apex, which purportedly revealed disc bulges and herniations, among other findings. After the MRI was performed, Path Medical continued to administer the same course of treatment.

> \* \* \*
>
> P.C.A. initiated treatment at Path Medical on October 17, 2017. Between October 17, 2017 and October 22, 2017, Path Medical purportedly provided hot/cold packs, chiropractic manipulation, manual therapy, e-stim, mechanical traction, neuromuscular reeducation, and therapeutic exercise on each date of service. On October 23, 2017, MRIs of patient P.C.A.'s cervical and lumbar spine were performed at Path Medical-Hallandale, which purportedly revealed bulging discs, among other findings. After the MRI was performed, Path Medical continued to administer the same course of treatment.

(Id. at ¶¶ 112-13 (citations omitted)). The complaint provides support for the predetermined protocol by alleging that the MRIs performed at Path Medical and interpreted by radiologists Dr. Desai and Dr. Ramos "virtually always reflect[ed] positive findings, most often consisting of purported disc 'herniations' or 'bulges.'" (Id. at ¶ 116).

Like the allegedly unnecessary MRIs, Plaintiffs aver that Path Medical physicians also regularly ordered unnecessary x-rays pursuant to the predetermined protocol, "often on two or more areas of the patient's body, despite the lack of any legitimate, documented clinical basis to order such x-rays in the records." (Id. at ¶ 117). Additionally, Plaintiffs allege that the patients were not properly reevaluated in light of any findings from the diagnostic

imaging and the Path Medical chiropractors and medical directors allegedly created final examination reports indicating that patients were permanently impaired regardless of the patients' pain score. (Id. at ¶¶ 120-27).

Plaintiffs provide an exhibit with over 3,000 claims that were allegedly fraudulently billed to Plaintiffs pursuant to the predetermined protocol. (Doc. # 1-1). These include each of the claim numbers, abbreviations of the patients' names, the patients' ages, the dates of loss, the first and last dates of service, the number of visits each patient made to Path Medical clinics, the examining physicians and/or chiropractors, the patients' diagnoses and treatments, and the amounts billed to Plaintiffs. (Id.).

In addition to the unlawful referrals and the medically unnecessary predetermined protocol, Plaintiffs allege that the medical directors knowingly failed "to comply with their statutory duties under Florida law." (Doc. # 1 at ¶ 7). Specifically, the medical directors did not "review any patient referral contracts or agreements between Path Medical and [1-800-411-PAIN]," "conduct systematic reviews of Path Medical's bills to ensure they are not fraudulent or unlawful," or "take immediate, corrective action upon discovery of an unlawful charge at Path Medical." (Id.).

Plaintiffs initiated this suit on October 16, 2020. (Doc. # 1). The complaint includes a claim for violation of the Florida Patient Self-Referral Act against Dr. Lewin and Path Medical (Count I). (Doc. # 1). Additionally, the complaint includes the following causes of action against all Defendants: common law fraud (Count II), violations of Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count III), violations of Section 1962(d) of RICO (Count IV), unjust enrichment (Count V), civil conspiracy (Count VI), aiding and abetting fraud (Count VII), and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count VIII). (Id.). Finally, Plaintiffs seek a declaratory judgment under 28 U.S.C. § 2201 against Path Medical (Count IX). (Id.).

On January 8, 2021, Defendants Dr. Lewin, 1-800-411-PAIN, Path Medical, and Path Medical Center Holdings moved to dismiss the complaint. (Doc. # 32). That same day, the other Defendants – the Path Medical chiropractors and medical directors – moved to dismiss the complaint and join the initial motion to dismiss. (Doc. # 33). Plaintiffs responded to both Motions on February 5, 2021 (Doc. # 54), and Defendants replied on February 24, 2021. (Doc. # 57). The Motions are now ripe for review.

9

## II.  **Legal Standard**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations and citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court must limit its consideration to "well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

10

The Federal Rules of Civil Procedure accord a heightened pleading standard to claims for fraud, requiring that they be pled with particularity. Fed. R. Civ. P. 9(b). Under Rule 9(b), the "plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiffs; and (4) what the defendants gained by the alleged fraud." Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1291 (11th Cir. 2010) (quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1380-81 (11th Cir. 1997)). This "requirement serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." W. Coast Roofing and Waterproofing, Inc. v. Johns Manville, Inc., 287 F. App'x 81, 86 (11th Cir. 2008) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)).

### III. **Analysis**

In their Motion, Dr. Lewin, 1-800-411-PAIN, Path Medical, and Path Medical Center Holdings, move to dismiss the complaint in its entirety, arguing that (1) the complaint is an impermissible shotgun pleading, and that (2) Plaintiffs

fail to sufficiently plead their claims under Rule 9(b) and Rule 12(b)(6). (Doc. # 32). In their separate Motion, the Path Medical chiropractors and medical directors move to join and adopt those arguments. (Doc. # 33). The Court will address each argument in turn.

## A. Shotgun Pleading

First, Defendants argue that the complaint should be dismissed as a shotgun pleading because it "is excessive [and] disjointed" and does not sufficiently differentiate between the actions of each Defendant. (Doc. # 32 at 30-31).

"A defendant served with a shotgun complaint should move the district court to dismiss the complaint pursuant to Rule 12(b)(6) or for a more definite statement pursuant to Rule 12(e) on the ground that the complaint provides it with insufficient notice to enable it to file an answer." Paylor v. Hartford Fire Ins. Co., 748 F.3d 1117, 1126-27 (11th Cir. 2014) (footnotes omitted). The Eleventh Circuit has "identified four rough types or categories of shotgun pleadings": (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts"; (2) a complaint that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) a complaint that does "not separat[e]

into a different count each cause of action or claim for
relief"; and (4) a complaint that "assert[s] multiple claims
against multiple defendants without specifying which of the
defendants are responsible for which acts or omissions, or
which of the defendants the claim is brought against." Weiland
v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1322-23
(11th Cir. 2015). "The unifying characteristic of all types
of shotgun pleadings is that they fail to . . . give the
defendants adequate notice of the claims against them and the
grounds upon which each claim rests." Id. at 1323.

Here, Defendants argue that the entire complaint falls
within the fourth category identified in Weiland. (Doc. # 32
at 25). However, the Court finds that the complaint includes
sufficient allegations as to almost every Defendant, except
Path Medical Center Holdings, to place them on notice of the
allegations against them. See Cont'l 332 Fund, LLC v.
Albertelli, 317 F. Supp. 3d 1124, 1140 (M.D. Fla. 2018)
("Other courts have also reached this nuanced distinction by
approving claims lodged against multiple defendants where the
activities undertaken by each defendant were alleged."). The
complaint explains the role of these Defendants in the scheme,
in that Dr. Lewin owned and controlled both 1-800-411-PAIN
and Path Medical Center Holdings, which in turn owns a

13

controlling interest in Path Medical. (Doc. # 1 at ¶ 15). Dr. Lewin devised and implemented the predetermined protocol. (Id. at ¶ 2). 1-800-411-PAIN was "used to solicit and steer patients to Path Medical." (Id. at ¶ 18). Path Medical owns the various medical clinics at issue in this case, and "knowingly submitted, or caused to be submitted, to [Plaintiffs] bills and supporting documentation that are fraudulent because they represent the services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered." (Id. at ¶ 19). Dr. Cheesman, Dr. Desai, Dr. Marino, Dr. Qian, Dr. Ramos, Dr. Thomas, Dr. Vazquez, and Dr. Wilensky are medical directors of various Path Medical clinics, such that they would have been responsible for ensuring accurate and lawful medical billing. (Id. at ¶¶ 21-28, 131-37). Dr. Desai and Dr. Ramos in particular examined the patients' MRIs. (Id. at ¶ 116). Dr. Chong, Dr. Golden, Dr. Kurzbuch, Dr. Lassiter, Dr. Lewis, Dr. Manocha, Dr. Nerbonne, Dr. Parchment, Dr. Sefick, and Dr. Vleko worked as chiropractors at the Path Medical clinics, and all allegedly implemented the predetermined protocol, providing patients with medically unnecessary services. (Id. at ¶¶ 29-38). The chart attached as an exhibit to the complaint lists the various allegedly fraudulent

claims, and which medical director or chiropractor treated each patient. (Doc. # 1-1).

This is sufficient and therefore does not constitute a shotgun pleading as to those Defendants under the fourth category identified in Weiland. See FFC Mortg. Corp. v. Red Door Title Ins. Agency, Inc., No. 13-61132-Civ-SCOLA, 2013 WL 12138556, at *3 (S.D. Fla. Dec. 12, 2013) ("These are specific acts that are connected to specific Defendants. The Court therefore finds that FFC has not simply lumped the Defendants together but has provided the specific acts attributable to Pollack and Martinez to give sufficient notice of the allegations of fraud against them.").

And, the Court disagrees with Defendants' contention that the complaint as a whole is so "excessive" or "disjointed" so as to constitute a shotgun pleading. (Doc. # 32 at 24). Although the Court appreciates that the complaint is lengthy, this is a complex case, and its length does not make it so that these Defendants are unable to prepare a proper response. See Bailey v. Janssen Pharmaceutica, Inc., 288 F. App'x 597, 603 (11th Cir. 2008) ("Moreover, a complaint – so long as it is minimally sufficient to put a defendant on notice of the claims against him – will not fail for mere surplusage.").

15

However, as previously alluded to, the complaint does not provide Path Medical Center Holdings with sufficient notice as to the claims against it. Indeed, although Path Medical Center Holdings is included in nearly every count of the complaint, the only factual allegation as to Path Medical Center Holdings is that it "controls, directs, and benefits from the activities of its wholly-owned subsidiary, Path Medical" and that it "owned controlled, directed, and benefitted from all aspects of the [p]redetermined [p]rotocol implemented at Path Medical." (Doc. # 1 at ¶¶ 2, 20, 39). Lumping Path Medical Center Holdings with the other adequately pled Defendants does elevate these insufficient allegations such that they satisfy Rule 8(a)'s notice pleading requirements, let alone Rule 9(b)'s particularity requirements. See Bentley v. Bank of Am., N.A., 773 F. Supp. 2d 1367, 1373 (S.D. Fla. 2011) ("Plaintiff . . . must treat each Defendant as a separate and distinct legal entity and delineate the conduct at issue as to each Defendant.").

Accordingly, although the Court declines to dismiss the complaint in its entirety as a shotgun pleading, the complaint is dismissed as to Path Medical Center Holdings for failing to provide it with adequate notice as to the basis for the claims against it. See Synergy Real Est. of SW Fla., Inc. v.

16

<u>Premier Prop. Mgmt. of SW Fla., LLC</u>, No. 2:11-cv-707-JES-SPC, 2012 WL 4009534, at *2 (M.D. Fla. Sept. 12, 2012) ("Although a complaint against multiple defendants is usually read as making the same allegation against each defendant individually, . . . factual allegations must give each defendant 'fair notice' of the nature of the claim and the 'grounds' on which the claim rests." (citations omitted)); <u>see also</u> <u>Erickson v. Merck & Co., Inc.</u>, No. 5:17-cv-562-JSM-PRL, 2018 WL 3626469, at *3 (M.D. Fla. Feb. 22, 2018) ("While the Court concludes the entire Amended Complaint is not a shotgun pleading, the Amended Complaint does contain several counts that lump Defendants together such that they are not provided sufficient notice.").

### B. **Florida Patient Self-Referral Act**

Next, Defendants argue that Count I, Plaintiffs' claim for violations of the Florida Patient Self-Referral Act against Dr. Lewin and Path Medical fails as a matter of law because: (1) the callers in this case are not patients within the scope of the Act, (2) the complaint does not allege that any healthcare provider made referrals, and (3) the Act does not provide a private right of action. (Doc. # 32 at 5-8). Because the Court agrees that the individuals who called 1-800-411-PAIN cannot plausibly be considered patients based on

17

the allegations in the complaint, the Court need only address this argument.

The Patient Self-Referral Act "prohibits physicians from making self-referrals to facilities in which they have a financial interest absent compliance with the statute's disclosure requirements." Aarmada Prot. Sys. 2000, Inc. v. Yandell, 73 So.3d 893, 898 (Fla. 4th DCA 2011). "The statute seeks to avoid potential conflicts of interest with respect to [the] referral of patients for health care services, while recognizing that it may be appropriate for health care providers to own entities providing health care services and to refer patients to those entities." Agency for Health Care Admin. v. Wingo, 697 So.2d 1231, 1232 (Fla. 1st DCA 1997).

Under the Act, "[a] health care provider may not refer a patient for the provision of designated health services to an entity in which the health care provider is an investor or has an investment interest." Fla. Stat. § 456.053(5)(a) (2020). The Act defines "health care providers" as including licensed physicians and chiropractors. Id. at § 456.053(3)(i). The Act does not, however, define "patient."

Although Defendants rely on a definition of "patient of a group practice" and "patient of a sole provider" in the Act for the proposition that these callers are not considered

18

patients, this definition is inapposite. (Doc. 32 at 6).
Indeed, the statute does not define "patient," but the broader
phrases "patient of a group practice" and "patient of a sole
provider." Fla. Stat. § 456.053(3)(n). This definition
explains what additional characteristics need to be met for
a patient to be considered a patient *of* a group practice or
sole provider. And, the definition of those phrases includes
the term patient, obviating the argument that this definition
defines "patient." Id. ("'Patient of a group practice' or
'patient of a sole provider' means a *patient* who receives a
physical examination, evaluation, diagnosis, and development
of a treatment plan if medically necessary by a physician who
is a member of the group practice or the sole provider's
practice." (emphasis added)).

Because "patient" is not defined by the Act, the Court
turns to the word's plain meaning. See U.S. Sec. & Exch.
Comm'n v. Big Apple Consulting USA, Inc., 783 F.3d 786, 796-
97 (11th Cir. 2015) ("When a word is not defined by statute,
we normally construe it in accord with its ordinary or natural
meaning." (quoting Smith v. United States, 508 U.S. 223, 228
(1993)). "When examining the plain and ordinary meaning of a
statute, 'one of the ways to figure out that meaning is by
looking at dictionaries in existence around the time of

enactment.'" <u>United States v. Chinchilla</u>, 987 F.3d 1303, 1308 (11th Cir. 2021) (quoting <u>Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sols.</u>, 852 F.3d 1018, 1026 (11th Cir. 2016)); <u>see also</u> <u>Glass v. Captain Katanna's, Inc.</u>, 950 F. Supp. 2d 1235, 1243 (M.D. Fla. 2013) ("In discerning a statute's plain meaning, the Florida Supreme Court 'looks first to the term's ordinary definitions,' which may be 'derived from dictionaries.'" (citations omitted)). "The Florida Supreme Court also examines the legislative history of a statute when determining the statute's meaning." <u>Glass</u>, 950 F. Supp. 2d at 1243 (citing <u>Knowles v. Beverly Enters.-Fla., Inc.</u>, 898 So.2d 1, 10 (Fla. 2004)).

Looking at dictionaries existing when the Patient Self-Referral Act was enacted in 1992, the Court finds that the plain meaning of "patient" is "[o]ne under medical treatment." Patient, The American Heritage Dictionary of the English Language (1st ed. 1969); <u>accord</u> Patient, The Random House College Dictionary (revised ed. 1982) (defining a "patient" as "a person who is under medical or surgical treatment"); Patient, Oxford English Dictionary (2d ed. 1989) (defining a "patient" as "[o]ne who is under medical treatment for the cure of some disease or wound; one of the sick persons whom a medical man attends; an inmate of an infirmary or

hospital" and noting that the definition of "patient" as "[o]ne who suffers from bodily disease; a sick person" is obsolete and that the definition that a "patient" is "[a] sufferer; one who suffers patiently" is "[n]ow rare"). Other courts have similarly defined "patient." See, e.g., In re Body Sci. LLC Pat. Litig., 167 F. Supp. 3d 152, 162 (D. Mass. 2016) ("Moreover, it lists as its first definition of patient, 'One who receives medical attention, care, or treatment.' Thus, to the extent that it is relevant, the dictionary evidence before the Court clearly favors a construction of 'patient' as a person who is receiving medical care or attention from a physician or other medical professional.").

This definition of "patient" is consistent with the Patient Self-Referral Act's legislative history. See, e.g., Florida Legislature: 1992 Summary of General Legislation 42 (1992) ("This legislation provides for the regulation of certain referrals by health care providers on two 'tiers.' Under the first tier a health care provider may not refer a patient (for whom he or she provides primary care) for the provision of designated health services[.]"). Plaintiffs do not provide any evidence of legislative history to the contrary. (Doc. # 54).

Here, the individuals who called 1-800-411-PAIN and were

later allegedly referred to Path Medical's clinics do not fit within the definition of "patient." There is no claim in the complaint that any of the individuals who called 1-800-411-PAIN were under medical treatment. (Doc. # 1). The only inference the Court can reasonably make from the allegations in the complaint is that individuals insured by Plaintiffs placed calls, and then some of those individuals were referred to Path Medical clinics. See (Doc. # 1 at ¶ 77) ("To date, State Farm has identified at least 15 State Farm Mutual and State Farm Fire insureds who called . . . [1-800-411-PAIN] and [were] treated at Path Medical."). Without more, it cannot be said that any individual who called 1-800-411-PAIN – whether insured by Plaintiffs or not – is a patient within the meaning of the Act.

Because these callers, as alleged, are not patients under the Patient Self-Referral Act, these referrals do not fall within the Act's scope. See Fla. Stat. § 456.053(5) (prohibiting only self-referrals of "patients"). Accordingly, the Motion is granted as to Count I, which is dismissed without prejudice.

## C. **Rule 9(b)**

Next, Defendants argue that the complaint, which sounds in fraud, should be dismissed for lack of particularity under

Rule 9(b). (Doc. # 32 at 8). Defendants also argue that the complaint does not adequately "establish [that] any objective falsehoods or false claims [were] submitted to [Plaintiffs]." (Id. at 9). Because the Court has already dismissed the complaint as to Path Medical Center Holdings, it considers this argument only as to the remaining Defendants.

When claims sound in fraud, the "plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiffs; and (4) what the defendants gained by the alleged fraud." American Dental, 605 F.3d at 1291 (quoting Brooks, 116 F.3d at 1380-81). This "requirement may be relaxed for allegations of 'prolonged multi-act schemes.'" Burgess v. Religious Tech. Ctr., Inc., 600 F. App'x 657, 662 (11th Cir. 2015) (citation omitted). This more "relaxed standard permits a plaintiff to plead the overall nature of the fraud and then to allege with particularity one or more illustrative instances of the fraud." Id. at 663. "Even under the relaxed requirement, however, a plaintiff is still required to allege at least some particular examples of fraudulent conduct to lay a foundation for the rest of the allegations of fraud." Id.

Here, a number of Plaintiffs' claims sound in fraud (Counts II, III, V, VII, VIII), and so Rule 9(b) heightened standard applies to those claims. See (Doc. # 1 at ¶ 1) ("This case involves a widespread fraudulent scheme[.]"). Plaintiffs provide several particular examples of the allegedly fraudulent insurance claims. (Id. at ¶¶ 87-88, 91-92, 105-06, 112-14, 125-26). These examples include the alleged misrepresentations, when they were made, and who was responsible for the misrepresentations. (Id.). Additionally, the complaint adequately explains how these fraudulent bills misled Plaintiffs, and what the Defendants gained through the scheme. (Id. at ¶¶ 5-6, 49-60, 81-86, 90, 93-104, 107-11, 117-24).

And, Plaintiffs provide a chart listing the over 3,000 allegedly fraudulent claims submitted to Plaintiffs between March 2017 and May 2020. (Doc. # 1-1). These include the claim number, the abbreviation of the patient's name, the patient's age, the first and last date of services, the number of the patient's visits to Path Medical clinics, the Path Medical physicians or chiropractors who examined the patients, the location of the services, the diagnoses and treatments performed, and the amounts billed. (Id.). The representative examples are sufficient to survive a motion to dismiss, given

24

the fact that this scheme allegedly occurred over a number of years. See ADT LLC v. NorthStar Alarm Servs. LLC, No. 9:18-80283-CV-DIMITROULEAS, 2018 WL 6504398, at *2 (S.D. Fla. Sept. 19, 2018) ("Further, at the pleading stage, these allegations of the ten specific instances of the alleged fraudulent conduct are sufficient to support the allegation of an overall fraudulent scheme.").

As to Defendants' argument that the complaint does not adequately demonstrate that the medical directors and chiropractors' medical opinions are objectively false under United States v. AseraCare, Inc., 938 F.3d 1278 (11th Cir. 2019), the Court begins by noting that AseraCare dealt with review of a determination of objective falsehood following a jury trial, not with dismissal at the pleadings stage. Id. at 1281. Even if AseraCare – a case concerning the False Claims Act – is applicable, the Court declines to dismiss the complaint for failure to prove that the medical opinions were objectively false at this stage. The complaint includes sufficient factual allegations to support Plaintiffs' contention that these claims are fraudulent at this juncture.

D. **Federal RICO Claims**

Next, Defendants move to dismiss Counts III and IV, Plaintiffs' claims under Sections 1962(c) and 1962(d) of

RICO, respectively, because the complaint fails to adequately plead (1) "an association-in-fact RICO enterprise" or (2) "a pattern of racketeering through mail fraud or any other RICO predicate act," and because (3) "it simply concludes that the [D]efendants conspired and confederated to commit conduct which itself does not constitute a RICO violation." (Doc. # 32 at 14-22 (internal quotation marks and citation omitted)). Again, because the complaint has already been dismissed as to Path Medical Center Holdings, the Court considers these arguments only as to the remaining Defendants.

### 1. Section 1962(c)

The federal RICO statute "was enacted in 1970 and prohibits racketeering activity connected to interstate commerce." Cisneros v. Petland, Inc., 972 F.3d 1204, 1210 (11th Cir. 2020) (citing Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1348 (11th Cir. 2016)). The statute reaches beyond organized crime and should "be liberally construed to effectuate its remedial purposes." Boyle v. United States, 556 U.S. 938, 944 (2009) (citation omitted). Section 1962(c) of the statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

To state a claim under RICO, Plaintiffs must plausibly allege that Defendants: "(1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of [Plaintiffs]." Cisneros, 972 F.3d at 1211. Here, the alleged predicate acts are violations of Section 1341 of the federal mail fraud statute. (Doc. # 1 at ¶ 169). Because Plaintiffs' RICO claims are based on the predicate acts of mail fraud, their RICO allegations must comply with Rule 9(b)'s heightened standard. American Dental, 605 F.3d at 1291.

Defendants allege that Plaintiffs have failed to adequately plead the second and fourth elements of their Section 1962(c) claim – that Defendants engaged in an (2) enterprise pertaining to (4) racketeering activity that included at least two predicate acts of racketeering. (Doc. # 36 at 16-19). The Court will address each of these elements.

a. **Association-in-Fact Enterprise**

Under the RICO statute, an "enterprise" is defined as "any individual, partnership, corporation, association, or

27

other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise must possess three qualities: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" Ray, 836 F.3d at 1352 (quoting Boyle, 556 U.S. at 946). "The purpose prong contemplates 'a common purpose of engaging in a course of conduct' among the enterprise's alleged participants." Cisneros, 972 F.3d at 1211 (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). "An abstract common purpose, such as a generally shared interest in making money, will not suffice." Id. "Rather, where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct." Id.

As to the first element, the alleged common purpose is the "defrauding [of Plaintiffs] through fraudulent claims for [PIP] [b]enefits." (Doc. # 1 at ¶ 167). Toward that endeavor, Plaintiffs aver that Dr. Lewin and 1-800-411-PAIN "solicite[d] and steer[ed] calls to Path Medical to exploit their [PIP] [b]enefits by billing for services that were not

medically necessary and not lawful." (Id. at ¶ 168). Dr. Lewin "designed, oversaw, and is responsible for the [p]redetermined [p]rotocol to exploit the [PIP] [b]enefits of patients who [were] treated at Path Medical," and "enabled Path Medical to circumvent [] licensure requirements." (Id.). Path Medical's medical directors, Dr. Cheesman, Dr. Desai, Dr. Marino, Dr. Qian, Dr. Ramos, Dr. Thomas, Dr. Vazquez, and Dr. Wilensky, as well as the chiropractors employed by Path Medical, Dr. Chong, Dr. Golden, Dr. Kurzbuch, Dr. Lassiter, Dr. Lewis, Dr. Manocha, Dr. Nerbonne, Dr. Parchment, Dr. Sefick, and Dr. Vleko, "purportedly examined and treated the patients at Path Medical and submitted, or caused to be submitted, bills and supporting documentation to [Plaintiffs] that were fraudulent because they were for treatment, diagnostic imaging services, and [durable medical equipment] that were not medically necessary and not lawfully rendered." (Id. at ¶¶ 168, 2). The medical directors further oversaw and implemented the predetermined protocol and failed to review patient referral agreements between Path Medical and 1-800-411-PAIN or Path Medical's billing. (Id. at ¶ 168).

Combined with the examples of repeated medically unnecessary care provided to patients at Path Medical, this is sufficient to demonstrate at this stage that Dr. Lewin, 1-

800-411-PAIN, Path Medical, the medical directors, and the chiropractors acted with a common purpose of defrauding Plaintiffs by submitting or causing to submit fraudulent claims for reimbursement of PIP benefits. See Gov't Emps. Ins. Co. v. KJ Chiropractic Ctr. LLC, No. 6:12-cv-1138-PGB-DAB, 2015 WL 12839138, at *6 (M.D. Fla. Feb. 16, 2015) (finding that the plaintiffs had sufficiently alleged a common purpose of fraudulently obtaining insurance benefits).

The complaint also sufficiently establishes a relationship among those associated in the enterprise, explaining each of the defendants' roles in the scheme, and considering the fact that both 1-800-411-PAIN and Path Medical Center Holdings were owned by Dr. Lewin. (Doc. # 1 at ¶¶ 2-9, 17-39); see Continental, 317 F. Supp. 3d at 1141 ("The Third Amended Complaint also establishes . . . a relationship between individuals that comprised the Scheme itself. First, it connects the acts with the Scheme's aims by alleging Defendants intended to defraud Continental[.] . . . Second, it establishes each Defendant's relationship with the Scheme by specifying their purported actions."). Additionally, the complaint adequately alleges that this scheme took place over a sufficient amount of time – particularly from at least January 2017 through December 2018. (Doc. # 1 at ¶ 4); see

30

Roche Diagnostics Corp. v. Priority Healthcare Corp., 407 F. Supp. 3d 1216, 1241 (N.D. Ala. Sept. 27, 2019) (noting longevity is met as long as "sufficient time has passed to allow defendants a chance to pursue the common purpose").

Finally, as to Defendants' argument that the enterprise alleged here is not sufficiently distinct from Defendants, the Court disagrees. (Doc. # 32 at 19; Doc. # 33 at ¶ 9). Defendants are correct that "a RICO enterprise must be an entity separate and distinct from any individual defendant" because "a person cannot conspire with itself." Cisneros, 972 F.3d at 1215. Here, however, the RICO enterprise is sufficiently distinct because it is comprised of not just Path Medical, but also the medical directors and chiropractors, Dr. Lewin, and, importantly, 1-800-411-PAIN. (Doc. # 1 at ¶ 165); see Ray, 836 F.3d at 1357-58 (explaining that outside vendors to the corporate defendant would be distinct from the corporate enterprise, although the case was dismissed as to those defendants for failure to allege a common purpose). Contrary to Defendants' argument, the Court cannot conclude as a matter of law at this stage that 1-800-411-PAIN is an agent of Dr. Lewin or Path Medical such that it would not be considered a distinct entity within the enterprise. See Lawrence Holdings, Inc. v. ASA Int'l, Ltd.,

No. 8:14-cv-1862-VMC-EAJ, 2014 WL 5502464, at *10 (M.D. Fla. Oct. 30, 2014) ("The Court notes that questions of distinctiveness between RICO actors and an enterprise present 'a fact-intensive inquiry.' . . . Thus, the Court determines that at this time it is appropriate to deny the Motion on this ground and allow this case to proceed to the summary judgment stage." (citations omitted)).

Accordingly, Plaintiffs have sufficiently alleged an association-in-fact enterprise. See <u>Continental</u>, 317 F. Supp. 3d at 1140 (finding the allegation of an association-in-fact enterprise supported where the complaint alleged facts that the enterprise had "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose").

### b. <u>Predicate Acts</u>

Next, Defendants argue that Plaintiffs have not alleged the predicate acts with particularity. (Doc. # 32 at 20-21). "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature." <u>Jackson</u>, 372 F.3d at 1264 (emphasis and citation

omitted).  To  allege  continuing  criminal  activity,  the plaintiff may either allege "a series of related predicates extending over a substantial period of time' or 'the threat of continuity.'" Cisneros, 972 F.3d at 1216 (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 242 (1989)).

Here, the predicate acts are mail fraud. (Doc. # 1 at ¶ 169). The elements of mail fraud include: "(1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails in furtherance of the scheme." United States v. Lander, 668 F.3d 1289, 1297 (11th Cir. 2012) (citation omitted). "The gravamen of the offense is the scheme to defraud, and any 'mailing . . . incident to an essential part of the scheme satisfies the mailing element,' even if the mailing 'contain[s] no false information.'" Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639, 647 (2008) (quoting Schmuck v. United States, 489 U.S. 705, 712 (1989)). As noted, because Plaintiffs' RICO claims are based upon mail fraud, they must comply with Rule 9(b)'s heightened pleading requirements. Drummond v. Zimmerman, 454 F. Supp. 3d 1210, 1218 (S.D. Fla. 2020).

Here, Plaintiffs aver that "[t]he bills and corresponding mailings that comprise the pattern of racketeering activity identified through the date of [the]

[c]omplaint are described, in part, in Exhibits 1; 21-23; 30; 39-41." (Doc. # 1 at ¶ 170). Indeed, attached to the complaint, Plaintiffs include a chart of over 3,000 allegedly fraudulent claims mailed to Plaintiffs from March 2017 to May 2020. (Doc. # 1-1). As previously noted, these include identifying information, such as the claim number, the amount billed, the date of the first and last services, and the date of loss. (Id.). And, in their complaint, Plaintiffs provide representative examples of allegedly fraudulent claims that were submitted to them. (Id. at ¶¶ ¶¶ 87-88, 91-92, 105-06, 112-14, 125-26).

Taken together with the complaint's explanation of the entities and individuals' roles in the scheme, why the scheme is fraudulent, and how these claims were submitted to Plaintiffs, these predicate acts are sufficiently pled under Rule 9(b). See Drummond Co. v. Collingsworth, No. 2:15-cv-506-RDP, 2016 WL 9980721, at *6 (N.D. Ala. Mar. 8, 2016) ("The Complaint lays out in detail the purpose and effect of the payments as to each witness, the genesis of those payments, who was responsible for facilitating and/or aware of the payments, and the specific circumstances of how each payment was made (including date of transfer, payor, payee, and means of sending the transfer). As such, contrary to Defendants'

34

contention, Plaintiffs have pled their claims with Rule 9(b) particularity[.]" (citations omitted)). Accordingly, the Motion is denied as to Count III.

### 2. Section 1962(d)

Defendants also argue that Plaintiffs have failed to adequately plead Count IV, their Section 1962(d) RICO claim, because Plaintiffs "simply conclude[] that the defendants conspired and confederated to commit conduct which in itself does not constitute a RICO violation." (Doc. # 32 at 22).

Section 1962(d) of the federal RICO statute "makes it illegal for anyone to conspire to violate one of the substantive provisions of RICO, including [Section] 1962(c)." American Dental, 605 F.3d at 1293 (citation omitted). "The essence of a RICO conspiracy claim is that each defendant has agreed to participate in the conduct of an enterprise's illegal activities." Solomon v. Blue Cross & Blue Shield Ass'n, 574 F. Supp. 2d 1288, 1291 (S.D. Fla. 2008) (citation and emphasis omitted).

"A plaintiff can state a RICO conspiracy claim by showing defendants: (1) agreed to the overall objective of the conspiracy; or (2) agreed to commit two predicate acts." Cardenas v. Toyota Motor Corp., 418 F. Supp. 3d 1090, 1102 (S.D. Fla. 2019). However, an agreement "need not be

35

established by direct evidence"; "it may be inferred from the conduct of the participants." Id. at 1103; see also Cisneros, 972 F.3d at 1220 ("A RICO conspiracy can be found through 'the conduct of the alleged participants or from circumstantial evidence of a scheme.'" (quoting United States v. Browne, 505 F.3d 1229, 1264 (11th Cir. 2007))).

Notably, "[u]nlike racketeering claims predicated on fraud under Section 1962(c), conspiracy claims under Section 1962(d) [need only] . . . satisfy Rule 8 pleading requirements." Cardenas, 418 F. Supp. 3d at 1103. "However, conclusory allegations, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy." Blevins v. Aksut, No. 15-00120-CG-B, 2017 WL 10410658, at *11 (S.D. Ala. Oct. 27, 2017) (citation omitted).

As previously discussed, Plaintiffs have adequately pled their underlying RICO violations to survive a motion to dismiss. Therefore, the Court declines to dismiss Count V as to the remaining Defendants for this reason.

### E. Civil Conspiracy

Next, Defendants argue that Count VI, Plaintiffs' civil conspiracy claim, fails because the complaint (1) "fails to allege any overt acts taken by [Defendants]" and (2) does not "adequately plead an 'agreement' to do an unlawful act or a

36

lawful act by unlawful means." (Doc. # 32 at 22).

To plead a civil conspiracy under Florida law, the plaintiff must sufficiently allege: (1) "an agreement between two or more parties," (2) "to do an unlawful act or to do a lawful act by unlawful means," (3) "the doing of some overt act in pursuance of the conspiracy," and (4) "damage to plaintiff as a result of the acts done under the conspiracy." Raimi v. Furlong, 702 So.2d 1273, 1284 (Fla. 3d DCA 1997). "An agreement between two or more parties occurs when there is an express or implied agreement of two or more persons to engage in a criminal or unlawful act." Gilison v. Flagler Bank, 303 So.3d 999, 1004 (Fla. 4th DCA 2020). "Each coconspirator need not act to further a conspiracy; each 'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators.'" Charles v. Fla. Foreclosure Placement Ctr., LLC, 988 So.2d 1157, 1160 (Fla. 3d DCA 2008) (quoting Donofrio v. Matassini, 503 So.2d 1278, 1281 (Fla. 2d DCA 1987)).

As previously noted, the complaint includes sufficient factual support for Defendants' role in the conspiracy. And, the complaint sufficiently alleges that Defendants agreed to submit or cause to be submitted fraudulent claims to Plaintiffs. (Doc. # 1 at ¶¶ 1-4, 182-83) ("Defendants . . .

37

each agreed to act and did act in furtherance of the common and overall objective of the conspiracy to fraudulently obtain [PIP insurance] [b]enefits[.]"). Accordingly, the Court declines to dismiss Count VI for these reasons. See Gilison, 303 So.3d at 1004-05 (holding that the complaint sufficiently alleged a civil conspiracy where it provided sufficient facts that the parties assisted in the fraud, and that the parties had at least an implied agreement to do so).

### F. Unjust Enrichment

Lastly, Defendants move to dismiss Count V, Plaintiffs' claim for unjust enrichment, arguing that (1) "it is not independent of wrongful conduct" and (2) "Plaintiffs have failed to plead a direct benefit conferred on" Defendants. (Doc. # 32 at 23).

To state a claim for unjust enrichment under Florida law, the plaintiff must sufficiently allege the following elements: "(1) [the] plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) [the] defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." Muy v. Int'l Bus. Machs. Corp., No. 4:19-cv-14-MW/CAS, 2019 WL 8161745, at *1 (N.D.

38

Fla. July 19, 2019) (quoting <u>Agritrade, LP v. Quercia</u>, 253 So.3d 28, 33 (Fla. 3d DCA 2017)).

"A number of courts hold that a claim of unjust enrichment may not be predicated on a wrong committed by a defendant." <u>AIM Recycling Fla., LLC v. Metals USA, Inc.</u>, No. 18-60292-CIV-ZLOCH, 2019 WL 1991946, at *1 (S.D. Fla. Mar. 4, 2019); <u>see</u> <u>Electrostim Med. Servs., Inc. v. Lindsey</u>, No. 8:11-cv-2467-VMC-TBM, 2012 WL 1560647, at *4 (M.D. Fla. May 2, 2012) ("Where a plaintiff predicates their unjust enrichment claim on wrongful conduct of a defendant, then the plaintiff's right of recovery, if any, arises from the wrong of the alleged tort rather than unjust enrichment." (citation omitted)).

Here, Plaintiffs' unjust enrichment claim provides that it is based on the submission of "charges for examinations, diagnostic imaging, and other services that were not medically necessary and not lawfully rendered[.]" (Doc. # 1 at ¶ 179). The Court cannot differentiate this wrong from the other torts alleged in this complaint, especially given that each count in the complaint incorporates the same set of paragraphs from the body of the complaint. (<u>Id.</u> at ¶¶ 152, 157, 164, 172, 177, 181, 186, 192, 195). And, the claim for unjust enrichment has not been pled in the alternative. <u>See</u>

39

AIM Recycling, 2019 WL 1991946, at *2 ("Nevertheless, viewing the pleading in the light most favorable to the non-moving party, the Court holds that Plaintiffs' unjust enrichment claim is adequately pled in the alternative in anticipation of Defendants claiming that they committed no wrong.").

Accordingly, the Motion is granted as Count V, which is dismissed without prejudice. See FreeStyle Slides, Inc. v. Super Sweet Air, Inc., No. 6:17-cv-169-CEM-GJK, 2018 WL 3819073, at *5 (M.D. Fla. July 9, 2018) ("Because Plaintiff's unjust enrichment claim is premised on wrongful conduct allegedly committed by Goldreyer, among others, Plaintiff's claim fails as a matter of law, and Goldreyer's request for dismissal must be granted.").

## IV.  Conclusion

Dr. Lewin, 1-800-411-PAIN, Path Medical, and Path Medical Center Holdings' Motion to Dismiss (Doc. # 32) is granted in part and denied in part. The Path Medical chiropractors and medical directors' Motion to Dismiss and to Join and Adopt Motion to Dismiss (Doc. # 33) is granted in part and denied in part.

The complaint is dismissed without prejudice as to Path Medical Center Holdings for failure to provide adequate notice as to the claims against it. Count I, Plaintiffs' claim

for violations of the Florida Patient Self-Referral Act, is dismissed without prejudice for failure to adequately allege that the individuals who called 1-800-411-PAIN and were referred to the Path Medical clinics were "patients" within the meaning of the Act. Count V, Plaintiffs' claim for unjust enrichment, is dismissed without prejudice because it is predicated solely on wrongful conduct allegedly committed by Defendants and has not been pled in the alternative. The Motions are denied as to any other requested relief.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendants' Motion to Dismiss (Doc. # 32) and Motion to Dismiss and to Join and Adopt Motion to Dismiss (Doc. # 33) are **GRANTED** in part and **DENIED** in part.

(2)  The complaint is **DISMISSED** without prejudice as to Path Medical Center Holdings, Inc. Counts I and V are **DISMISSED** without prejudice as to all other Defendants.

(3)  Plaintiffs may file an amended complaint by **May 4, 2021.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 20th day of April, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE